Next case is number 06-1394 Mitchel Stockwell v. Eli Lilly v. Crabtree Mitchel Stockwell, I represent Dr. Crabtree and Dr. Plutsky. Dr. Crabtree and Dr. Plutsky contend that they should be listed as co-inventors on several patents owned by Eli Lilly that relate to protein C. The basic facts outlining why they believe their co-inventors are outlined in our briefs. In order to prevail on this appeal, we have to persuade the court that the district court committed error on summary judgment. The error with regard to the inventorship issue relates to two issues. First, we think the district court's holding is directly at odds with this court's decision in FINA. Second, we think the district court overlooked the contribution that Dr. Crabtree and Dr. Plutsky provide. Oh, Mr. Stockwell, let me ask you about the contribution. There's no question that they made a contribution to this project to clone the gene for protein C. On the other hand, the major part of the work was done at Lilly. It was finished up at Lilly and really put together at Lilly. The question I have is whether Dr. Crabtree and Dr. Plutsky made contributions that were really not material to the success of the project. Did they provide things and advice that were not utilized by the Lilly people such that whether or not they made the contributions, the project would have succeeded in the way it had without Dr. Crabtree? Did Dr. Crabtree make key contributions without which the project would not have succeeded? Did they make inventive contributions? Your Honor, I think you put your finger on one of the arguments Lilly makes, and let me address that in two ways. What's undisputed in the record and what was found in the district court's opinion at 847 is that the clone, the PHC-8 clone that Dr. Crabtree and Dr. Plutsky sent to Dr. Long was sequenced by Dr. Long in March 1984. And Dr. Long wrote that down and said this is part of the protein C sequence. That was the first clone that was found. But it wasn't ultimately used to make the final gene, was it? Your Honor, it was used in several ways. We detail that in our briefs. First, that material was used as a positive control when Dr. Beckman and Dr. Long found their own clones. Second, all of the evidence shows that when Lilly and the doctors wrote publications that announced the scientific success of the project, they listed all three of the clones, PHC-8 from the doctors, PBHC-12 from Dr. Beckman, and PHC-1 from Dr. Long. The evidence shows that you can put together all three of those clones to achieve the claimed sequence. The evidence shows that Dr. Crabtree's clone was about 42% of the claimed sequence. Your Honor, the question you ask goes to the heart of what it means to be in a collaboration with inventors. If you're on a football team and you're on the winning team, you achieve a score and you win the game, but you only played in the first half of the game and you only scored points in the first half of the game, that means you're still part of the team. That's not inventorship. Football is not inventorship. The question is did they make key contributions without which the result would not have been achieved. I don't like the football analogy. The answer is absolutely. When they agreed to the collaboration between Dr. Long and Dr. Crabtree, Lilly approached Dr. Crabtree for his expertise. They were failing. Dr. Long had tried to probe the Liver Library. He was not able to find a clone. Only by providing his probe to Dr. Crabtree was Dr. Crabtree able to find a clone. Once Dr. Crabtree had found the clone and had blazed the path, only then could Dr. Long find his clone. This really relates to obviousness. All of us can look at post-it notes and think, gee, I could have done that. That's exactly what happened here. It happened in the context of Dr. Crabtree and Dr. Long agreeing they were going to have a scientific collaboration. It cannot be the law that Lilly can say, oh, we obtained Dr. Crabtree's clone. We sequenced Dr. Crabtree's clone. We set that aside and assigned our employees to literally reinvent the wheel. We only claimed the wheel they invented, even though we had agreed with Dr. Crabtree and Dr. Plutsky that they were going to be part of the scientific collaboration. Because with respect to a property right, we Lilly want to only list our employees as inventors. We want to leave off Dr. Crabtree and Dr. Plutsky. If we agree with you, we would presumably conclude that your clients are co-inventors of the patent which claims the gene by structure. But there are two other patents. Why would your clients be co-inventors of a method of treating protein C-related disorders and pharmaceutical compositions containing protein C? Did they do anything with respect to those two inventions? There's two answers to that. First, generally, if you look at the claims in those subsequent patents, they also claim the sequence that is described in the first patent. Well, they claim the use of it. Exactly. And the formulation of it. Exactly. But your clients didn't participate in the formulation of protein C or the treatment with protein C. But the novelty of those claims is in the sequence. Second, there was testimony and evidence that Dr. Crabtree and Dr. Long discussed the uses to which protein C would be put and agreed on those uses. The evidence is also shown in the articles that the doctors wrote. Are these divisions of the original patent? I apologize. Are these all related patents? Yes, Your Honor. They all share the same specification and are based on the original filing. And there's also evidence in the record that Dr. Crabtree had suggested certain cell lines that helped Dr. Little in learning how to express the gene. Let me go back to the essential error the district court made. When you read the district court's opinion, at 847 the district court acknowledges that the clump that Dr. Crabtree provided is the sequence for protein C. At 847 and 848 it says, okay, wait a minute. It was not until later that Dr. Long and Beckman found the cDNA clone. And at 848 it accepts Lilly's theory. It says, according to the standard for conception of a chemical compound, it was not until this later identification that anyone had conceived of the sequence. This is nothing less than the doctrine of simultaneous conception of reduction of practice, which this court has repeatedly approved for use in priority cases as it relates to gene inventions. We do not challenge that doctrine as it relates to priority issues. But this court has said in FINA and in related cases that that doctrine has no application to a joint inventorship dispute. In fact, FINA says the doctrine cannot be used to show that because the first person did not conceive that were reduced to practice the entire claimed invention, he or she did not at least contribute in some significant way to the conception. That is what happened here. When Dr. Crabtree and Dr. Plutsky sent that clone, they sent a portion of the sequence to Lilly to a skilled person receiving that biological material to describe the gene. The patent office recognizes that with the deposit program. Did Dr. Long ask for it? Yes, Your Honor. Dr. Long could not successfully obtain a clone using his probe in Dr. Crabtree's library. So Dr. Crabtree was not a volunteer who pushed his way in. He was invited in as part of a collaborative effort. That is absolutely what the record shows, and that's why after Dr. Long failed, he sent the probe to Dr. Crabtree. That's why Dr. Crabtree sent the clone back. In fact, the other significant fact that's in the record is that Dr. Long and Dr. Crabtree agreed that Lilly would do the sequencing. Dr. Crabtree had the experience doing the sequencing because he had discovered the fibrinogen gene just a few years earlier. Dr. Long said he wanted to have the experience doing it, and more significantly, Lilly had just obtained an oligonucleotide sequencer, so it would be relatively easy for them to complete the sequencing. Dr. Crabtree agreed. That's why Lilly obtained the sequence. It was part of the overall collaboration. And this is really the whole point of the district court's error. By focusing on the wrong legal standard, trying to declare when does the entire conception occur, which clearly was when Dr. Santier assembled the two sequences, the district court missed the entirely relevant fact that Dr. Crabtree and Dr. Plutzke provided this key clone that comprised 42% of the claimed sequence, and that was their contribution to co-inventorship. If you affirm the district court's decision in this case, think about the consequences. You're saying that in gene patent cases, only the person that actually assembles the sequence is the person who's the inventor. And in thinking about the consequences as well, because consequences really relate to inventorship, the theory of where the line is to be drawn in this particular case, on these particular facts, is difficult. But any invention is based on dozens or maybe thousands of interactions and experiences, and in the final stage, there is a point at which the requirements of the patent statute are met, and you have an invention. And before that stage, it's not complete, or you don't have what you have. It was known that the gene and protein C existed. It was known at this point, I gather, what the characteristics of these products were. A certain amount of the sequencing was already known, and the difficulty that I'm having is figuring out at which stage, and I think Judge Lurie well put it, the contribution was such as part of a collaborative effort, rather than seeking to build on knowledge that's already available in the prior art. At what stage was, in fact, the invention that's claimed made? Now, according to what you're telling us, that invention was actually conceived at the beginning of the collaboration. Is that right? No, Your Honor. Or in the bovine probe? No, Your Honor. That is not correct. Okay. We agree with the district court's finding that the entire structure was known when Dr. Santier assembled the sequence listing. Okay. That's undisputed. We agree with that. However, what we contend is that by providing a clone that represented 40% of that sequence as part of an admitted collaboration, there's no dispute about that. That is co-inventorship. And at minimum, it is enough evidence of co-inventorship to raise a genuine issue of material fact for resolution by jury. But there are no claims just to that clone. You're entirely correct, but joint inventorship does not require the inventor to picture the entire chemical structure on his own. That's sole inventorship. Joint inventorship only requires there to be a collaboration, and you must have the collaboration. And that guards against somebody coming in and just giving a suggestion. Here, there was an agreed-upon collaboration between Dr. Crabtree, Dr. Long, and Dr. Plutsky. That protects the concern that the court has. And the other part of it is they did provide the first clone. They provided the way in which Lilly could find subsequent clones. That's joint inventorship. I will save the rest of my rebuttal time. Okay, thank you, Mr. Starkey. May it please the court, Don Knievel representing Lilly. The key question that the court has to face, and really the only question is, what does it require to be a co-inventor? And the court's cases have established that. It's not a contribution to the invention. It is not helping the inventive process. It is a contribution of a conception. And that's clear from the Hess v. Advanced Cardiovascular case in which the alleged co-inventor had been very extensively involved in discussions and suggestions. What if a conception doesn't work out? If you conceive a compound, and, of course, presumably they didn't conceive the structure of this gene of initio. Say one conceives a compound and a method for making it, and the method doesn't work out. And then a second person comes in and says, Aha, this is the way you can make that compound. Doesn't that person who made a contribution, a necessary inventive contribution to reduction of practice, become a co-inventor? Well, there's an authority in this case that says if there's no other way of getting to the end result except a contribution to reduction to practice, then that person who creates the only way to reduce it to practice could be a co-inventor. There was no such testimony here. The evidence was that hybridization conditions were in the public domain and well known. They're not in the claim. The number one requirement, though, to be a co-inventor is to contribute to something that's claimed. In the Hess case, this court rejected the contributions of Mr. Hess, even though they're extensive, by saying whatever contribution Mr. Hess made to Dr. Simpson and Robert did not constitute conception. Whatever contributions he made did not constitute conception, and therefore did not make Mr. Hess a co-inventor of the catheter claim in the 071 patent. Isn't that an error of law, saying that only conception results in inventorship? Well, there's one exception that the court has at least thought is a possible exception, and it's only said it's a possible exception, and that is if there's only one way to reduce it to practice and the person contributes the one way, that person might be a co-inventor. But there's no such evidence. Well, where was the conception here? Well, the conception here was at the very latest. Excuse me, the very earliest. Mr. Beckman writes in his lab notebook, we now have the entire sequence of human protein C. That's a lab notebook page that we can show you where he writes down in June of 1984, we now have the complete conception because we've combined two clones, PBHC12, and the B is important because that means Beckman, and PHC1. Now we know what the sequence is. Now how do we know today that PHC8, which derived in some way from what was presented by the doctors, how do we know today that that has something to do with protein C? They didn't know it at the time. Mr. Plesky has said when he sent the materials to Lilly, he didn't know if it was protein C or a homolog. He didn't know at the time. How do we know today to be able to say that's protein C? Tell me again. When was the complete conception of the complete structure as recited in Claim 1? It's this lab notebook, June of 1984. One thing I can't read that, and it's quite predictable because it's rather small handwriting, but it's very clear that it does not track Claim 1 with all of the stated nucleotides. That's right. This says, though, most importantly, is the fact that this clone overlaps with the 3' clone, PHC1, isolated by G long. This means we now have sequence representing the entire mRNA of human protein C. That's when the conception starts because they now say we have things that can be put together to create the entire sequence of protein C. We can now look backwards and say, PHC8, because it has a sequence that lines up or responds to this, we couldn't have said it in advance. Was PHC1, was the nucleic acid structure of PHC1 known at that time? Yes, they had sequenced it. That's how they knew that they had it. They had sequenced PBHC12, a Lewy clone. There's a reference here to PBHC8, not to be confused with PHC8, which came from something the doctor provided. Was the sequence of 12 known? As of the time of this, it was known. The sequence of PHC1 was known. They looked at these and said, aha, we now today have the complete sequence of the gene. As of this date, which is June of 1984. Well, they know it. They didn't have it. They knew it. Yes, they had it in their records. They had sequenced PHC1. But they didn't have a method of putting them together. They did not. That's what completed the conception when Dr. Santier then takes the two clones, and that's in the record, takes the two clones, PBHC12, PHC1, shows how you can combine them to create a single... Wasn't there a lot of back and forth contribution from Dr. Crabtree that Lilly asked for and welcomed and utilized? Not at that point. The latest contribution of the doctors... No, but after the conception, when they were trying to reduce it to practice. Not that I'm aware of, Your Honor. They say they submitted some genomic clones that Lilly used to confirm something later, but that's not part of this conception. There's nothing about genomic clones in the claim. No, but beyond the conception, accepting that that's a conception, they had to have had a method of making it. Yes. So the question is whether Dr. Crabtree and his associate made inventive contributions to enable the Lilly people to put it together. There's no evidence that they did. They haven't even argued in this case that they provided anything after this. They're saying they provided hybridization conditions, which takes us back to before they found the clone that they say derived from their work. There's nothing in the record before this court that says they made any contributions to the expression of a protein, to the recognition that this was capable of expressing a protein. They tried to express a protein themselves, they say, and couldn't make it happen. Lilly took this work from June of 1984, took it to Dr. Santir's work of how to combine the two to create a plasma, put it in a host cell, express protein C. The doctors have made no argument that they did anything along these lines. There's no corroboration that they did. Didn't Dr. Crabtree provide human genomic clones leading to Dr. Long's isolation of PHC-1 and Dr. Beckman's isolation of 12? No, they say they provided, but that genomic work that came later was used by Lilly to confirm that what derived from this expression was in fact human protein C. None of that work came prior to this time period of June of 1984. As I pointed out, accepting that as a conception, what came afterwards, the question is, didn't that contribute to reduction to practice? There's no evidence that it did, and there's no evidence it was inventive, no evidence it couldn't have been derived from someplace else. And Lilly expressed protein C. There's no evidence that has been put into the record before this court that the doctors had anything to say about that, let alone who did. There's going to have to be some corroboration somewhere to separate out what one doctor did from another. Mr. Stockwell keeps talking about the doctors. They can't collectively have invented anything. There's nothing that would support either of the doctors having done anything to assist this effort. After this document in June of 1984 that says we now have the sequenced expression was done by Lilly people. The isolation was done by Lilly people. The sequencing was done by Lilly people. The recognition that this sequence was in fact protein C. Remember... Now, there was a publication. And of course, co-authorship in a publication is not the same and necessarily determinative of co-invention. Absolutely. That's very clear. But this was a paper on the cloning of the gene for protein C. And Dr. Crabtree was listed as a co-inventor. Co-author. Sorry, co-author. And he certainly made contributions in this process. Absolutely. And you know why he was added? Because on beyond the end of the claim sequence, on beyond the three prime end, which is where PHC-1 stops, there are some non-coding regions that were important to the article but were not important to the claim. The claim stops at the end of the coding sequence, stop codon. PHC-8 has material that goes on beyond that, was important for purposes of education and scientific curiosity. That's the testimony as to why that was added. They were added as authors. But the claim itself stops before there is anything in PHC-8, by the way, which was isolated by Dr. Wong and the sequence was known by him and corrected later when he found out it didn't match up. But there's nothing in the claim that required in any way PHC-8. PHC-8 is too short to match with either of the things that Lilly found. The two of them are sufficient. Once you have the things that Lilly found, PHC-8 is redundant. That's why it was not used. It was determined to be too short to match with what they had. The Lilly scientists, using their own better library that generated longer pieces, found PHC-1, sequenced it, isolated it, knew what it was. Found, sequenced, isolated, PBHC-12. Seeing those two together, seeing that they overlap, they said, aha, we now have the complete sequence for human protein C. Now we can go backwards. Now we have the sequence, we can go backwards and look at what came from the doctors. By now, lo and behold, there's some coding errors in this, but how do we know now what that was? We now know it relates to protein C because of this conception. Had there not been this conception, PHC-8 would still today be an unknown because we wouldn't know if it was protein C or a protein related to protein C because Dr. Plesky said, when I sent it to Lilly, whatever I sent, which I can't corroborate, I didn't know whether it was protein C or some other thing in the bounds of the probe that Dr. Long sent to me. So the conception can't occur earlier than when the sequence for human protein C is recognized as being what it is. You can look backwards then and say, well, what the doctors provided met that requirement, but invention is a thought process, a conception of the sequence. So the doctors did not know that what they had related to protein C as opposed to something else. They certainly didn't know about the claimed sequence, which is in there. So the conception cannot have occurred prior to this lab notebook and what took place later. You keep walking away from the reduction to practice aspect and focusing on drugs. I understand that because there's nothing that's been put forward by the doctors, including their reply brief, that said we supported the reduction to practice. They're saying we put in a genomic clone which was used to confirm that what was generated was human protein C. Confirmation is not reduction to practice. Confirmation isn't in the claim. What that means is the reduction to practice had already taken place, at which point Lilly arguably confirms it. But there's no reduction to practice evidence that's been put forward in this record. Below, there's a suggestion that they presented a cell line. That's not in the record here. Below, there's a suggestion that they provided some transfection protocols. That's not in the record here. Those have been abandoned. So there is no argument on this record about a contribution to the reduction to practice. And by the way, the reduction to practice, as I understand this court's case, is an exception to the rule that invention turns on conceptions and it's in the rare case when a reduction to practice is impossible, impossible, without a contribution from a third party. There's no such evidence in this case. So for our purposes, once you determine that a conception is required for a contribution except in the rare case where a reduction to practice is impossible, the doctors made contributions of some sort. They were clearly involved. But they didn't make an inventive contribution. And if an inventive contribution is something that's in the claim, remember the claim is to a constructed DNA compound in some claims having a particular sequence, but in all claims having the ability to express human protein C. Are you saying that if they had first provided THC-12, not 8, the rest of the activity would have been the same? They would have been co-inventive? Well, it's a possibility because certainly Dr. Long presented one of these clones, Dr. Beckman and Mr. Beckman presented the other. They together recognized the sequence. It would have been a different case, but it's not this case because what they provided, number one, they didn't know what it was, did not know what it was. The record is clear they did not know what it was. They knew it hybridized, stuck to the clone, the probe that Dr. Long had sent them to Bobak. They knew it did that, so they knew it was either a homolog, protein C, or a false positive, but they didn't know what. Later, when Dr. Long looks backward in time, he says, well, it must be what I later discovered because it's closed, but he found sequencing errors in which he then corrected. So the conception can't have taken place. Earlier when Mr. Beckman and Dr. Long had the overlapping clones, said this is the sequence for not something, but the sequence for human protein C, which is in the claim. If the claim had simply been to a sequence that does anything, homologs or otherwise, again, it might be a different case, but the claim is to a particular sequence that generates human protein C activity. So the conception has to relate to that. The claimed sequence, which the doctors did not know, didn't contribute to, that has to relate to something generating human protein C activity, which the doctors didn't know. All of the things you can say about what P8C8 was can be done only in hindsight after this conception. Otherwise, it's just a clone out there that has unknown usefulness and unknown significance. So Mr. Stockwell can say, well, P8C8 was 40% of the claimed sequence. His doctors couldn't have said that until they knew what the sequence was, because he didn't know it. And you're saying it didn't become part of the reduction to practice of the total sequence? Did not. It's not used. You can't use it. You can see that. If you take P8C8, and by the way, remember that was sequenced by Dr. Long, isolated by Dr. Long based on the only corroborated testimony from impure materials. That's all the corroboration shows. If you only have P8C8 and P8C1, you don't get the claimed sequence. If you only have P8C8 and P8C12, you don't get the claimed sequence. If you have both P8C1 and P8C12, you don't need it and it wasn't used. So there is no contribution, Your Honor, to the conception, and there's not even an allegation, let alone evidence, that this was an essential contribution to reduction to practice, even though you're right, there's an exception to the law that perhaps needed to be recognized, but not in this case since it's not relevant. Okay. Thank you, Mr. Knievel. Thank you. Mr. Stockwell? At A2089 and A2114, both parties' experts agree that P8C8, P8C1, and P8C12 in fact could have been combined to construct the full-length sequence of human protein C. The record also shows that Dr. Jorge Plutsky wrote in his notebook that he nailed Lilly Purified PC. I think Mr. Knievel has identified a potential fact dispute over whether or not the doctors knew that what they had found was protein C,   susceptible to summary judgment. I think one of the things the Court is struggling with is the way the law and the science have been trying to make it clear that the two science here do not match. And I would ask the Court to go back and look at your Amgen opinion, Judge Lurie. In that opinion, you cite to an expert who says that before you can sequence anything, you must find the clone. You cannot get the sequence without the clone. When you have the clone, skilled persons have an enabling disclosure of the gene because they can sequence. Sequencing is not the difficult part. It's finding the clone. Here, Dr. Crabtree and Dr. Plutsky found the initial clone. The record as demonstrated in our brief at pages 14 and 15 show that Dr. Long used PHC-8 as the positive control with the hybridization  Dr. Crabtree gave him to find PHC-1. The record shows that Dr. Beckman's probe B was the probe that was based on and synthesized on the genomic clone that Dr. Crabtree sent. Mr. Knievel's contention that these probes, that these clones had nothing to do with Dr. Crabtree and Dr. Plutsky's work is belied by the record. That's why they're co-inventors. Thank you. Thank you, Mr. Stockwell and Mr. Knievel. The case is taken under submission. Thank you. so much.